**TEXAS & N. O. R. CO. et al. v. BOLTON.**
**(No. 2446.)**

(Court of Civil Appeals of Texas. Texarkana. Nov. 25, 1921. Rehearing Denied Dec. 1, 1921.)

I. Railroads ⬡➝370 — Operatives held under duty to blow whistle to warn contractor working in cut.

Where the operatives of a train knew that a contractor was engaged in working with his teams in a cut, from which he could not see an approaching train for more than 150 yards, and it was the custom of trainmen to follow a rule requiring them to blow a whistle to warn him on approaching the cut, they owed him the duty to give timely warning by blowing the whistle, and he could rely on their performance of such duty.

2. Railroads ⬡➝389(4)—Failure to blow whistle held proximate cause of contractor's injury.

Where a contractor who was working with his teams in a cut was injured when he was struck by the train while attempting to get a team out of the cut, the failure of the train operatives to blow the customary warning whistle was the proximate cause of his injury, even though he saw the train in time to reach a place of safety himself and was in a place of safety until thrown towards the track by a sudden movement of a team.

3. Negligence ⬡➝56(1)—Proximate cause of injury defined.

If the injury is a natural and probable consequence of the negligent act complained of, that act is correctly taken as the proximate cause.

4. Railroads ⬡➝400(10) — Contributory negligence of contractor held for jury.

A railroad contractor working in a cut, who was attempting to get his teams out of the way of an approaching train and who flagged the train in plenty of time for it to have stopped, *held* not contributorily negligent as matter of law.

5. Railroads ⬡➝400(14)—Issue of discovered peril of contractor held for jury.

Where a railroad contractor, attempting to get his teams out of the cut in front of a train which had not given timely warning of its approach, signaled the engineer to stop in plenty of time, and there was no evidence that the engineer did not see the teams or the contractor's signal, the plaintiff was entitled to have the issue of discovered peril submitted to the jury, though he was not personally in danger until the instant before the team struck him, when he was thrown toward the track by a sudden movement of the team.

6. Trial ⬡➝260(1)—Request covered by special issue properly refused.

An assignment of error to the refusal to give a special requested charge will be overruled, where the charge was sufficiently covered in a special issue as submitted to the jury.

7. Appeal and error ⬡➝1004(1)—Verdict supported by evidence and not shown to have resulted from passion affirmed.

A judgment will not be reversed because of amount of damages allowed, where it does not appear from the record there was any passion or prejudice on the part of the jury and there was evidence of permanency of injury to a degree which would authorize the jury to fix the amount found in the verdict.

Appeal from District Court, Cherokee County; L. D. Guinn, Judge.

Action by O. P. Bolton against the Texas & New Orleans Railroad Company and others. Judgment for the plaintiff, and defendants appeal. Affirmed.

The appellee received personal injuries by being struck in his side and back by the engine of a freight train, and he brought this suit to recover damages therefor. He was an independent contractor engaged by the railroad company to do ditching and track-grading at Fry's Gap, and he had been at the work at the place in question for about one week before the day of his injury. The place of work was in a cut about 250 yards long, between 20 and 30 feet wide, and about 15 feet deep. The railway track runs in an easterly to westerly direction through the cut. At the west end of the cut the railway track begins to curve, and continues to curve in conformity with the cut for about one-third of its length. The appellee had in his employ and was in immediate charge of ten men, each with teams using plows and scrapers. At about 10 o'clock a. m. of the day in question, a freight train of about 15 cars came from the west, going east. The train was scheduled to arrive at the point at about 9 o'clock a. m., but customarily ran on irregular time. The train approached the cut without whistling or ringing the bell, and was not discovered by those in the cut until it was about 150 yards from the end of the cut. After seeing the approaching train, the appellee began directing the unhitching and moving to safety of the teams, and received the personal injuries by being struck by the engine under the circumstances later on stated.

The grounds of negligence pleaded by the appellee are:

"That on or about September 28, 1920, the plaintiff was in the employ of the defendant, working on its right of way and roadbed about five miles northwest from Jacksonville at or near Fry's Gap, and was engaged in repairing the tracks and roadbed and in cleaning out the ditches; that his employment required him to

be on and about said track; that he and others working under his direction had been engaged at this particular place for approximately a week in similar employment, and with the knowledge of the defendant, its agents and employees; that the defendant had promulgated a rule requiring all trains approaching the place where plaintiff and the others were engaged at work to sound the whistle and ring the bell and give warning of the approach of trains, and to slow down or run slowly; that the plaintiff knew of and relied on this rule."

And

(1) "That on or about the date aforesaid, while the plaintiff was engaged in his work, defendant, through its agents, servants and employees, negligently failed to sound any warning or ring the bell or blow the whistle, or otherwise notify the plaintiff of the approach of the train or slow down or run slowly; that plaintiff was diligently engaged in the work of his employment and relying on due care of observance of the rule aforesaid by the defendant, its agents, servants and employees."

(2) "That the operatives of the train which struck the plaintiff knew full well of the employment of the plaintiff and the others at the time and place aforesaid, and of the promulgation of the rule and of the reliance of the plaintiff thereon, and they negligently failed to observe said rule, which was the direct and proximate cause of the plaintiff's injuries."

(3) "That the operatives of the locomotive observed, saw and discovered and actually knew of the plaintiff's employment, situation and peril, and that he was relying upon the rule and that he did not observe, realize or know that the train was approaching; and they negligently failed to sound the whistle, ring the bell or stop said train or lessen the speed thereof, or in any manner to exercise ordinary care to use all the means reasonably available for the purpose of avoiding injury to the plaintiff; and that such failure was the proximate cause of his injuries."

The defendant answered by general denial and a general plea of contributory negligence on the part of the plaintiff.

The case was submitted to the jury on special issues, and in keeping with the answers of the jury the court entered judgment for the plaintiff. The findings of the jury are:

(1) That through failure on the part of the operatives of the train to blow the whistle in warning of the approach of the train, sufficient time was not afforded the plaintiff and the men in the cut to remove the teams and themselves from the cut and avoid the danger (consequent upon being in the cut while a train was passing through it), and that such failure was negligence proximately causing the plaintiff's injuries, and

(2) That the operatives of the train actually saw plaintiff and the teams, and in a perilous situation, as the train approached, and in time to have avoided the perilous situation and the injury by the exercise of ordinary care, and that there was a failure of the operatives to exercise ordinary care, which was, under the circumstances and situation, negligence proximately causing the plaintiff's injuries, and

(3) That the plaintiff did not come in contact with the train on account of any movement of his own at the time, and that any independent movement of the plaintiff did not contribute to his injury.

The evidence shows that when the train reached the place in question at about 10 o'clock a. m., appellee and his ten employees under him were, as they had been during the week, at work ditching in the cut. The employees were driving teams pulling plows and scrapers, and the appellee was personally directing the work being done. A part of the crew were at work on the south side of the railway track about the middle part of the cut, and the other members of the crew were at work on the north side of the track between 40 and 60 feet further towards the west. The train in approaching the cut, and in coming into it, was running at a rate of speed of 15 miles an hour, and did not slacken the speed or stop until after the injury happened. The whistle was not blown and the bell was not rung to give warning of the train's approach. The approach of the train was first discovered by one of the employees working in the cut, at a time when the engine was about 150 yards distant from the west end of the cut; and he holloed, "The train is coming!" Immediately the employees, appellee directing them, began to unhitch the teams and make efforts to get them out of the cut. Three of the teams were driven out of the cut, but two teams failed to get out before the train entered the cut. A witness testified, and without dispute:

"When the train was discovered approaching, we proceeded to try to get the teams out. * * * The people working there proceeded to get out of the cut. Some of the teams were afraid of the train, and my understanding was that the orders were to get them out of the cut whenever a train was coming."

The evidence of the appellee, which is without dispute in the record, is, as material, as follows:

"Everything was going along pretty smooth at the time. I was over on the spur side where some teams were ploughing, and I was helping plough there, and the first thing I knew some one, I believe it was Jack Huddleston, hollowed and said the train was coming. I then ran from the spur side across the main line track to the ditch on the south side, where there were two teams in about 30 or 40 feet of the runway. I got those two teams out, and I then got out the third team. The other two teams I failed to get out; and seeing that I wasn't going to get them out, I commenced flagging the train down; and again when we got within about 60 or 70 feet I flagged for him to slow up. If he had slowed up, I could have got all the teams out easy; but he didn't make any effort towards slowing up or blowing the whistle or ringing the bell, and came piling on through. Little later on, he kept piling on;

I was standing over there next to the bank. I thought this team was going to scare and run opposite from the way it was going. I got in the back of the ditch to keep from getting hit by the train. Just about the time they got even with me, the train went on from me, and they went to whirl back on this bank, but instead of whirling on the bank they turned towards the train. I run from the bank and got up over towards the team, and was something like 8 or 9 feet from the end of the ties to the back of the ditch we had ploughed down. We had ploughed it and it was sloping, and that still left about 4 feet between me and the train. This team didn't whirl back on the bank, but turned back towards the train, and that was the last thing I could remember. When the team did that, I was kinder in front of the team like, and it was ploughed down on the bank, and there was a ridge about that wide (indicating) I could stand upon. They hadn't ploughed the last two or three furrows. I was standing up there. The team turned and was going through there, and the train was coming along over here. The train hadn't quite got to me when the team started to whirl around towards the bank. Instead of whirling on the bank, they turned back the other way. When they did that, it placed me in such shape I didn't remember anything further. I didn't remember anything until I got about halfway, or about the sand pit, coming into Jacksonville. Something hit me. I knew I was hit. I don't know what it was, but the best I could tell it hit me about the shoulders or small part of my back. It seemed to have given me more trouble in the small of the back than anywhere else. I was facing the train like. I was standing back here kinder facing the train as it came by. When this team got scared and done all the whirling across as if to get up on the bank, they whirled back towards the engine, and that was the last I knew. It was all done so quick I couldn't tell just how it did happen, and I don't think anybody else on the work could tell just how it happened. * * * I know the train hit me, and the reason I know is like you would know if you had noticed it hit me. I saw the train just about the time it was striking me. I was in a whirl there trying to get out of the way."

The appellee further testified as follows:

"We had instructions from the section foreman with regard to what was to be done (by the train operatives) in approaching the cut. * * * He (the section foreman) said to me that the men at the office and these trainmen know where these teams are working at. * * * After the first day of our work they blowed for the road crossing there every time. * * * They had always been blowing for us or giving us some signal after the first day of our work. * * * Trains before this day gave notice of their approach before they got there. * * * Just before you get to this cut it is upgrade; it would have been easy to have stopped. I thought he could have stopped (the train) in 20 feet, as he wouldn't have anything to do except cut off the steam and would have to use mighty little air. * * * I flagged them (the operatives of the train) down with my hands. Flagging with my hands meant

to slow up and stop. The engineer could have seen me for 150 yards, and he could see the teams going out of the runway. * * * When I first flagged him (the engineer), he was 75 yards from me, and the second time the engine was something like 50 or 60 feet from me. I don't know whether that team ran against me or not; when it whirled about I know that I got against the train. * * * I know the engineer saw me all the time."

The witness Jarrett testified:

"The cut was about 200 yards and a little better long, or about 600 or 700 feet long. The cut was not wide enough on either side of the rail for the team or those teams to have stayed there and let the train pass unless they were standing perfectly still. If the team was gentle, stood perfectly still, and had backed against the cut, the train could have passed. * * * The last time I saw him (plaintiff) before the train obscured my sight of him was when he had taken a step or two towards the team as though he had an idea to assist the young man driving the team, and about that time the train passed, and I did not see anything else. The team Mr. Bolton's attention was drawn to was in the cut. It drew my attention from the way it was acting. He did not have the team out of the cut when the train passed. * * * The custom was that the trainmen would blow the whistle—they usually whistled. * * * A man could see people working in this cut from west end, I would say, 150 yards; it may be possible to see further than that."

The evidence, we conclude, supports the jury's findings of negligence proximately causing the injury sued for in failure of the train operatives to exercise ordinary care in avoiding the injury after discovering the perilous situation and danger of plaintiff, and of negligence proximately causing the injury in failing to give timely warning of the approach of the train to permit the appellee to have the teams withdrawn from the cut in virtue of the custom to give timely warning by blowing the whistle so as to permit the withdrawal of the teams from the cut, and of the amount of the verdict.

Garrison, Pollard, Morris & Berry and Baker, Botts, Parker & Garwood, all of Houston, and F. B. Guinn, of Rusk, for appellants.

Norman, Shook & Gibson, of Rusk, for appellee.

LEVY, J. (after stating the facts as above). Error is predicated upon the refusal of the court to give a requested special charge peremptorily instructing the jury to return a verdict in favor of the appellant upon the ground that, under the evidence, there were no issues of negligence to submit to the jury which, as a matter of law, could have been the proximate cause of the injury sued for. The points urged are: (1) That as the appellee saw the approaching train 150 yards distant from him and had sufficient

time to go, as he did, to a place of safety, seven or eight feet from the track and in full clearance of the train, the failure to blow the whistle as a warning of the approach of the train could not be, as a matter of law, the proximate cause of his injury; and (2) that as the appellee was not on the railroad track, but safely standing seven or eight feet from it and in full clearance of the train and flagging the engineer until the engine was parallel and opposite to him, the engineer could not possibly have anticipated that the appellee would come in contact with the engine, and therefore the evidence does not, as a matter of law, raise an issue of discovered peril.

The contention of appellant seems to be founded on a construction of the evidence as establishing only the simple facts of a person, after seeing an approaching train 150 yards distant from him, placing himself at a point 7 or 8 feet away from the track and in safe clearance of the train and standing there in that safe place, the engineer .seeing him thus situated, until the time the engine is exactly parallel and opposite to him, and then suddenly in some way changing that position in the direction of the train so as to be struck by the end of the pilot beam of the engine. It is clear that the contention of appellant would be tenable, and ordinarily would be sustained, if the evidence should be viewed and considered as presenting only the simple facts stated. Ry. Co. v. Williams, 41 S. W. 501; Ry. Co. v. Gray, 95 Tex. 424, 67 S. W. 763; Ry. Co. v. Staggs, 90 Tex. 458, 39 S. W. 295; Ry. Co. v. Sheeter, 94 Tex. 196, 59 S. W. 533; and other cases. But the evidence here discloses a distinctive and special condition different from the usual and ordinary situations described in the cases, surrounding and known to the parties at the time of the occurrence on which the controversy is based, that must be taken into account and considered as a basis upon which to predicate an actionable fault or wrong. The facts admittedly show that appellee was at work under a contract with appellant, by the terms of which he was to do ditching and grading in a cut 250 yards long, between 20 and 30 feet wide, and 15 feet deep. The appellant's railway track, on which trains were operated, ran through the cut in conformity with the considerable curve of the cut. The performance of the work was by means of workmen driving, teams pulling plows and scrapers, the appellee personally supervising the work. The labor required the immediate and constant attention of the appellee and his workmen. The cut and the track at the west end had a considerable curve, and a train could be seen for about 150 yards from the cut. And it appears that without timely notice of the approach of the train, in the unsafe and perilous position in which they would be put, there was danger of an injury

from the train to the appellee and his workmen if the teams were not withdrawn from the cut by the time the train reached and commenced to enter the cut. The place of work was rendered unsafe and perilous to appellee and his workmen, and probably to the train, if the teams were not withdrawn from the cut by the time the train began to pass through it, by reason of the width of the cut (10 or 15 on each side of the track) and the embankments (15 feet high) and the natural disposition of some of the teams, confined in this inclosure, to get excited at the train and become unruly and run away, dragging the scrapers if not unhitched from them. Appellee had been at work at the place about a week when the occurrence in suit happened. And during that time, upon the timely warning that was given of the approach of the train, he had regularly removed the teams from the cut. A witness testified that—

"The custom and habit while on this job had always been—we always heard the whistle in time to get out; we always had been able to get the teams out; we never left them down in the cut when the train came; we always made it a practice to get them out."

And it further appears without dispute that after the first day the work in the cut commenced it was "the custom," and "usually" done, for the operatives of the engine to blow the whistle before reaching the cut, as a timely warning to the appellee and his workmen of the approach of the train, for the purpose of permitting the withdrawal of the teams from the cut before the train reached it. And it conclusively appears that appellee relied on the custom to blow the whistle in timely warning of the approach of the train in order to enable him to withdraw the teams from the cut before the train reached and began to enter the cut. At the time of the occurrence in suit the whistle was not blown in accordance with the usual custom. According to the undisputed evidence, appellee saw the approaching train at a point 150 yards distant from the end of the cut; but it is further apparent that from the time he saw the train until it (running at the speed of 15 miles per hour) reached a point opposite to him, there was not reasonably sufficient time within which to unhitch and withdraw all of the teams from the cut. He had gotten clear of the track and was attending an excited and unruly team held by a boy about 7 or 8 feet from the track. And it appears appellee flagged the train to stop. The engineer, it appears, seeing the perilous situation and danger, the view being clear and open to him, did not heed the flagging, twice given, and did not stop or slacken the speed of the train. According to the only evidence offered, the train, coming upgrade, "could have stopped in 20 feet. He would not have anything to

do except cut off the steam, and would not have to use but mighty little air."

[1] At the time the engine reached a point nearly opposite the team, they whirled in the direction of appellee and caused him to come in contact with the pilot beam of the engine, occasioning injury to him. Whether or not the appellee was struck by the team when they whirled, or suddenly moved his position to avoid being hit by them, does not distinctly appear in the evidence. If it could be said that in all these circumstances no fault or negligence is chargeable to the appellant, or if the injury which occurred could by no reasonable probability have been foreseen and averted and was one which no reasonable person would have anticipated, the liability cannot be predicated against appellant. There can, of course, be no fault or negligence where there is no act or service or duty which a person is bound to perform or fulfill. But in all the circumstances, and in view of the practice and custom of appellant through the train operatives to blow the whistle, was it thereupon the duty of appellant's train operatives to give the accustomed timely notice of the approach of the train by blowing the whistle? The only apparent way in the circumstances to sufficiently make known the train's approach was to give timely warning by blowing the whistle. And knowing that the appellee and his employees were at work with teams in the cut, and of the situation surounding them, the operatives of the train adopted, as must reasonably be concluded, this custom and practice of giving timely warning of the approach of the train as a method of exercising ordinary care to avoid any injury or probability of injury to those at work in the cut at a time when the train was going through it. The law itself, under the circumstances, would require the exercise of reasonable care on the part of appellant's train operatives. And the method of exercising ordinary care by the practice of blowing the whistle was in the general scope and authority of the operatives of the train. It is manifest from the circumstances of the case that there is shown some obligation or duty which the appellant's train operatives left undischarged and unfulfilled at the time of the occurrence. This custom and practice to give timely warning by blowing the whistle fixed the duty to be performed by appellant's train operatives, and on which the appellee relied. Blackwell v. Ry. Co., 111 N. C. 151, 16 S. E. 12, 17 L. R. A. 729, 32 Am. St. Rep. 786; Hinkle v. Ry. Co., 109 N. C. 472, 13 S. E. 884, 26 Am. St. Rep. 581.

[2] And the very occurrence which happened by reason of its nonobservance was the one intended to be prevented by the custom of giving timely warning by blowing the whistle. It is true that appellee was cognizant of the approach of the train, and in time to get himself off the track, but not in time to withdraw all of the teams from the cut and thereby remove the danger and probability of injury to him in the situation surrounding him. Hence appellee was in the same attitude as would be a person not having seen the train at all, so far as having time to avert the injury was concerned. And as the very injury happened which was intended to be prevented by the custom of giving timely notice of the train's approach, that injury may be considered as directly caused by the nonobservance of such custom, not causes independent of that violation happening solely to produce the injury, and appellee not being guilty of contributory negligence. There is a causal connection between the nonobservance of the custom of giving timely warning and the injury resulting to appellee.

[3, 4] It is the rule that if the injury is a natural and probable consequence of the act complained of, then that violation is correctly taken as the proximate cause of the injury. 1 Thompson on Negligence, §§ 52 and 59; Wehner v. Lagerfelt, 27 Tex. Civ. App. 520, 66 S. W. 221. And it is believed that it cannot be said in the case, as a matter of law, that appellee was guilty of contributory negligence, or that the train did not in fact strike and injure him. All the circumstances surrounding the parties must be considered in measuring the reasonable care, and the proximate cause of injury from failing to use it, devolving upon appellant's train operatives at the time of the injury; and not the bare fact, dissociated from all the other facts and circumstances, that appellee had sufficient time to get himself 7 or 8 feet in the clearance of the train from the track.

[5] But if it should be erroneous (and we do not think it is) to hold that the failure to give timely warning by blowing the whistle was the proximate cause of the injury, then the issue of discovered peril was sufficiently raised, we conclude, to warrant the trial court in refusing a peremptory instruction. The facts show that one of the teams, still hitched to a scraper, became excited at the approaching train, and that the appellee, assisting in the efforts to quiet it, flagged the train to stop when the train was 75 yards distant; and the team becoming more unruly, seemingly trying to "run away," appellee again flagged the train, then a distance of about 60 feet, to slow up or stop. As testified:

"The cut wasn't wide enough on either side of the rail (of the railway track) for this team to have stayed and let the train pass unless they were standing perfectly still. * * * If the team was gentle, stood perfectly still, and had backed against the cut, the train could have passed."

There is evidence sufficient to show that the engineer saw the situation and probability of injury to the appellee. The train, coming upgrade, could have stopped, it was

shown, within 20 feet. There is no evidence to the contrary of this. The train did not stop, nor was any effort made to slacken its speed. There is an absence of any circumstances showing the exercise of reasonable care on the part of the train operatives, after seeing the appellee's perilous situation and probability of injury from the train, to avert the injury to him. It is thought that it cannot be said, as a matter of law, that the injury was one which by reasonable probability could not have been foreseen, or which no reasonable person would have anticipated might happen. Ry. Co. v. Tinon, 117 S. W. 936. The two issues above discussed were pleaded by the appellee; and the court was not, it is concluded, in error in submitting them to the jury. Therefore assignments of error No. 1 and the assignments relating to the points numbered 2 to 9, inclusive, and No. 11, are overruled.

[6] The special charge requested and refused as complained of in the eighth assignment of error was sufficiently covered, we think, in the issue of contributory negligence as submitted by the court to the jury; and the assignment is overruled.

[7] The tenth assignment predicates error upon the amount of the judgment. It does not appear from the record that there was any passion or prejudice on the part of the jury in assessing the amount they did, and there is evidence of permanency of the injury to that degree that would authorize the jury, as in their province, to fix the amount found in their verdict.

The judgment is affirmed.

⊜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes